JOHN BRADLEY, JR., PETITIONER-APPELLANT, v. HENRY
TOWNSEND MOVING & STORAGE CO., RESPONDENT-
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 14, 1977—Decided February 10, 1978.

468

Before Judges CONFORD, MICHELS and PRESSLER.

*Mr. Philip Bolstein* argued the cause for the appellant (*Messrs. Bassin and Bolstein,* attorneys).

*Mr. Edwin J. McCreedy* argued the cause for the respondent. (*Messrs. Conant & McCreedy,* attorneys).

The opinion of the court was delivered by

PRESSLER, J. A. D. Petitioner appeals from a judgment of the Division of Worker's Compensation awarding him permanent partial total disability of 60% based on a work-connected back injury. The gravamen of this appeal is that the judge of compensation erred in not finding him permanently totally disabled either by reason of the orthopedic injury alone or under the "odd-lot" doctrine. Our review of the record persuades us that petitioner was entitled to the benefit of the odd-lot doctrine and that the findings below did not justify the judge's conclusion to the contrary.

This petitioner is now 49 years old. He received a primary education in Virginia, completing the ninth grade. He began his working career at the age of 9 or 10, doing heavy manual labor, primarily in the moving and storage industry. From 1957 continuously to the date of this accident in 1973, he worked for this respondent as a helper on a furniture moving truck. During the course of this employment he had sustained two minor back injuries, one in 1964 and one in 1971, but sought compensation only for the first, for which he received an award of 3-½% permanent partial disability. He also injured his left knee on the job in 1968 receiving compensation in the amount of $500. The instant accident occurred in May 1973 when he herniated two disks, L4–5 and L5–S1, while carrying a refrigerator on his back from the moving truck to a second floor apartment. His active medical treatment for this injury continued for approximately two years and involved, among other procedures and treatments, a double laminectomy resulting, however, in only

one laminectomy having properly fused; a rehospitalization where traction was used in an effort to relieve his pain; the recommendation which he rejected of further surgery to correct the previous unfused laminectomy; administration of analgesics, and other palliative regimes. He was discharged in June 1975, still in considerable pain, by his treating orthopedist, who testified in his behalf and whose opinion it was that his condition would remain static with no likely significant improvement. It was also this witness' opinion that petitioner could not "conceivably" return to any work requiring heavy labor, standing for lengths of time or bending or lifting. Petitioner has not in fact ever returned to work and believes himself unable to work because of his constant pain, for which he still takes daily medication, and because of the severe limitations of physical movement. His income is limited to a monthly social security disability payment of $319.

In further support of his claim of total disability petitioner relied on the testimony of a psychologist specializing in vocational rehabilitation and a forensic orthopedist as well as a written report from a forensic neurophychiatrist and from the New Jersey Division of Vocational Rehabilitation Services. It was the conclusion of the last that petitioner's inability, some two and a half years after the injury, to sit or stand for more than short periods of time effectively removed him from the competitive labor market and that no vocational goal was then feasible. The psychologist reached essentially the same conclusion based on his examination of petitioner. I. Q. testing placed him in the lowest 10 percentiles of the population and within the dull-normal range. His grade-level aptitude was fifth grade. Further intelligence, aptitude and personality testing persuaded the psychologist that the petitioner had only minimal reasoning and abstraction ability and although he might, albeit with difficulty because of his age, be trained to do a simple, repetitive task, his ultimate realistic work opportunities,

considering his physical disability as well, would be in sheltered employment or in a job provided by a "benevolent" employer. He further suspected that petitioner might have minimal brain damage. Petitioner's forensic psychiatrist found him to be suffering from a work-connected anxiety neurosis disabling him to the extent of 25% of permanent partial disability and the forensic orthopedist found him totally permanently disabled by reason of the back injury alone.

Respondent's proofs consisted of the testimony of its forensic orthopedist and the report of its forensic neuropsychiatrist. The latter concluded that petitioner was only minimally psychiatrically disabled. The orthopedist evaluated the back injury at 20% of permanent partial disability. His findings also included the observation that petitioner had no capacity to bend backwards and that he had limited capacity to bend forward and to rotate. While it was his opinion that petitioner would be employable in any job in which he did not have to bend backward, he did not suggest with particularity what such job might be available to a person experienced only in heavy manual labor, with seriously limited intellectual abilities and with a minimal primary education.

In dealing with these proofs the judge of compensation expressly found the petitioner to be "substantially credible." His one expressed reservation was that he felt petitioner to have somewhat exaggerated his reliance on the cane he was using. He did not, however, suggest that petitioner was a malingerer and his evaluation of the orthopedic injury at 60% of permanent partial is reflective of his acceptance of its serious nature and consequences.

Our disagreement with the judge's conclusions lies not in his evaluation of the back injury but in his refusal to find petitioner totally disabled as an odd-lot. Despite the recent reaffirmation of the odd-lot doctrine by the Supreme Court in such cases as *Barbato v. Alsan Masonry*, 64 *N. J.* 514 (1974) and *Germain v. Cool-Rite Corp.*, 70 *N. J.* 1

.(1976), we nevertheless cannot but discern an apparent hesitancy by the Division of Worker's Compensation to apply that salutary doctrine, which has long since been part of the substantive law of this State. See *Rodriguez v. Michael A. Scatuorchio, Inc.*, 42 *N. J. Super.* 341 (App. Div. 1956), certif. den. 23 *N. J.* 140 (1957). We emphasize again the holdings of *Barbato* and *Germain*, namely that "* * * if, because of handicaps personal to the worker over and above the limitations on work capacity directly produced by his accidental injury, he is unemployable on a regular basis in a reasonably stable job market, he is to be considered totally disabled for workmen's compensation purposes." *Germain, supra,* 70 *N. J.* at 9. Evaluation of pertinent personal handicaps which may affect employability involves consideration of such matters as intellectual capacities, employment experiences, physical debilities, general background, education and age. *Barbato, supra,* 64 *N. J.* at 529. Considering all of the relevant factors here involved, we have no doubt that petitioner convincingly proved that he was odd-lot, at least prima facie, and that respondent did not begin to carry its burden of showing that regular work within his capacity was available to him. *Barbato, supra,* 64 *N. J.* at 529.

Although we appreciate the deference we are obliged to accord administrative-agency fact-finding, see *e. g., Close v. Kordulak Bros.*, 44 *N. J.* 589 (1965), we nevertheless find inadequate, both factually and legally, the judge's reasons for concluding that petitioner was not odd-lot. The first of these was his observation that petitioner had not only not looked for work but was also unmotivated to do so by his receipt of social security benefits. But as *Barbato* points out, undue emphasis on that circumstance, in view of proof that there is no realistic work opportunity for petitioner and in the absence of a supportable finding that petitioner is a malingerer who voluntarily withdrew from the labor market, misses the point of the odd-lot doctrine whose

\* \* \* pivotal feature \* \* \* is its recognition that the mental status of the aged, ill-prepared and injured employee is significantly affected when for the first time in his life such a person finds himself unable to return to his accustomed work — usually as a manual laborer, as is the case in the majority of the "odd-lot" situations — and faces an imponderable uncertainty as to his financial affairs and the remainder of his work life.

The day has long since passed when we can remain indifferent to such an employee whose remaining alternative in life is to sit by idly and await arrival of his social security or pension check, feeling worthless and unavailing, knowing that he can no longer meaningfully contribute his employment. 64 *N. J.* at 530.

■ The other reason for the judge's refusal to apply the "odd-lot" doctrine developed during the testimony of petitioner's psychologist, who noted that petitioner had served two tours in the Army Air Force, one from 1946 to 1949 and the second from 1950 to 1952, when he was recalled during the Korean conflict and served in Korea as a platoon sergeant and drill instructor. It was the judge's assumption that the abilities necessary to have achieved that rank "seem to be inconsistent with the low evaluation intellectually that was accorded petitioner" by the psychologist. We make no such assumption and deem it inappropriate for the judge to have accorded such weight to a fact so peripherally introduced without any exploration of what petitioner's service record was, the effectiveness of his performance, the wartime conditions in which he served, or similar relevant considerations. The fact remains that for the next twenty-one years petitioner's sole occupation was carrying furniture between trucks and houses, and we ascribe no evidential weight to battlefield experiences taking place in unknown circumstances and with unexplored effect two decades earlier.

We are satisfied from the foregoing that petitioner was entitled to be adjudicated totally disabled as an "odd-lot" on his unrefuted prima facie case. The respondent is, of course, free to seek relief in the future should "petitioner's subsequent activities \* \* \* disprove the correctness of the determination." *Germain, supra,* 70 *N. J.* at 9.

■ We make one further observation regarding the procedure followed here. *Germain v. Cool-Rite Corp., supra*, 70 N. J. at 10, prescribed a simple method to be employed when an odd-lot disability is claimed. The pretrial memorandum should so specify and the respondent is to be afforded the opportunity at the close of petitioner's case to move for a ruling as to whether or not a prima facie odd-lot case has been made so that it may know whether it must produce proof of employability. That procedure was not here followed although petitioner's pretrial memorandum was filed some six weeks after *Germain* was decided. The record is clear, however, that respondent well knew that petitioner was relying on the doctrine, and, therefore, had the opportunity, had it wished to avail itself of it, of seeking the "prima facie" ruling and coming forward with specific employability proofs. This it failed to do.

The judgment of the Division of Worker's Compensation is modified and the matter remanded for entry of judgment consistent with this opinion.

MICHELS, J. A. D. (dissenting). I respectfully disagree with the majority that the petitioner is "totally disabled as an 'odd-lot'". I am convinced that the findings of the judge of compensation that

> . . . petitioner is not totally disabled by reason of any combination of circumstances. There is no evidence of a persuasive nature that indicates that he is unemployable either by reason of a combination of mental or physical inadequacies as a matter of reasonable medical probability, . . . .

could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the expertise of the judge of compensation and his opportunity for hearing and seeing the witnesses. *DeAngelo v. Alsan Masons, Inc.*, 122 N. J. Super. 88, 89–90 (App. Div.), aff'd o. b. 62 N. J. 581 (1973); *Close v. Kordulak Bros.*, 44 N. J. 589, 599 (1965).

The testimony of Dr. Morton Gittleman, whose qualifications as an expert in the field of industrial medicine and disability evaluation were admitted at the trial, in and of itself clearly supports these findings, as evidenced by the following excerpts of his testimony:

Q Doctor, at that time [February 3, 1976], did you perform a physical examination of Mr. Bradley? A I did.

Q Would you give us the results of that examination? A. He was observed to walk normally, carrying a cane with little or no support on the cane. He removed his outer clothes for the examination, made the erect position and was not wearing a lumbosacral back support which he had worn at the prior examination. There is no objective evidence of injury to the lower back other than the residual scarring and some comment or complaint of sensitivity is made on pressure into the scarred area of the lumbar soft tissues. Swelling present in the soft tissues and ligaments which had been seen on the prior examination is no longer seen. He bends forward, bringing the finger tips to the mid forelegs and in rotating brings the finger tips to the opposite foreleg with complaint of feeling it in the lower part of the back; the pulse being a normal one of 72 per minute. No comment was made on assuming the erect position. While his back was both observed and felt, he again complained of feeling it in the forward bending movement; offered none on assuming the erect position. With the feet fixed to the floor and arms held alongside of his body, rotation to either side is normal with complaint of feeling it across the lower back. By separating the legs widely and the feet again fixed to the floor and arms held rigidly alongside of his thighs he slid them down to the outer knee level, again with complaint of feeling it across the lower back. He is able to stand on either leg and raise the opposite leg with the knee flexed to hip height and swinging and extending the leg fully forward and backward without complaint. Knee and ankle jerks were equal and normal. Pulse, again, at the end of the examination still remained at the normal rate of 72 per minute.

Q At this time, did you again estimate permanent disability? A I did.

Q And what was your estimate of disability? A Examination at this time revealed substantially the same findings as were made on the prior examination, except that he had previously worn a lumbar back support which he was not wearing this time and fullness, which had been noted in the lumbar soft tissue area at that time, is no longer present. The remainder of the examination remains essentially the same.

In my opinion there is no indication for further treatment and on an orthopedic and orthopedic-neurological basis it still remains my opinion that the permanent partial disability is 20 percent of total.

Q Doctor, considering your findings on physical examination, as well as the results of both your examinations, do you have an opinion as to whether or not Mr. Bradley is capable of gainful employment? A I have.

Q And what is that opinion? A He is able to do any type of work which would be made available to him.

\* \* \* \* \* \* \* \*

CROSS-EXAMINATION BY MR. BOLSTEIN:

Q Does that include the heavier type of physical laboring work that he was doing for Townsend Moving and Storage Company when this happened, Doctor? A It would include exactly the same, except where he might have to bend backwards, which he can't do.

Q Are you saying, Doctor, that this man, in the condition in which he was when you saw him, with the residuals of the removal of herniated discs at L4–5 and L5–S1 with the spinal fusions from L4 to S1 with an evaluation of disability in your estimation of 20 percent was capable of doing every type of heavy physical laboring work, including that requiring repetitive bending and lifting provided he didn't have to do any backward bending? A Yes, it is.

Q Well, Doctor, what does the 20 percent indicate then? A That's the residuals of the physiological changes which have been made anatomically in this man's back by first removal of a disc, which is a laminectomy and secondly, the fusion in his back. Functionally, the results were normal ones, as evidenced by the pulse rate, which in the first examination was minimal from the man, but in the second one was not and the movements are the same.

Accordingly, I would affirm the judgment of the Division of Workers' Compensation.